**FILED**

2001 OCT 22  P 6: 38

U.S. DISTRICT COURT
DISTRICT OF UTAH

Jonathan O. Hafen (6096)
Stephen E. W. Hale (5285)
PARR, WADDOUPS BROWN GEE &
LOVELESS
Suite 1300
185 South State Street
Salt Lake City, UT 84111-1537
Tel.: (801) 532-7840
Fax: (801) 532-7750

Timothy S. Cole
Maria V. Martin
RUBIN & ASSOCIATES, P.C.
MCS Building, Suite 202
10 South Leopard Road
Paoli, Pennsylvania 19301
Tel.: (610) 408-2010

Attorneys for Merrill Lynch, Pierce,
Fenner & Smith Incorporated

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | | |
|---|---|---|
| MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, a Delaware corporation, | ) ) ) | **MERRILL LYNCH'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| RUSSELL K. CANNON, an individual, | ) ) | Case No. 1:01CV-127 |
| Defendant. | ) ) | Honorable Tena Campbell |

---

Plaintiff Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch")

submits this Reply Memorandum in support of its Motion for a Temporary Restraining Order

and Preliminary Injunction. This Reply Memorandum will respond to the arguments raised by

Defendant Russell K. Cannon ("Defendant") in his opposition brief, namely that: 1) the majority of defendant's arguments are irrelevant since they address enjoining Defendant's acceptance of account transfers, a remedy Merrill Lynch has not sought in this case; 2) Defendant violated his Merrill Lynch employment agreement by misappropriating Merrill Lynch customer names by memory and then using this information to solicit Merrill Lynch customers; 3) Defendant's conduct will cause Merrill Lynch irreparable harm; and 4) Merrill Lynch is within its contractual and statutory rights in seeking injunctive relief from this Court pending an arbitration before NASD-Dispute Resolution, Inc.

## I.    INTRODUCTION

Quite simply, many of the arguments raised by Defendant can be summarily dismissed because they do not address the particular circumstances of this case.  Specifically, Merrill Lynch is seeking injunctive relief enjoining Defendant from further soliciting any business from Merrill Lynch customers in accordance with his employment agreement.  By contrast, most of Defendant's arguments against injunctive relief are premised upon Merrill Lynch seeking to enjoin Defendant from accepting transfers.  Merrill Lynch has elected not to seek that remedy in this case.  Therefore, Defendant's arguments in this regard are wholly irrelevant.

Defendant violated the express terms of his Agreement in two ways.  First, by taking and using Merrill Lynch customer names for a purpose not related to Merrill Lynch's business interests.  Specifically, by memorizing Merrill Lynch customer names so that Defendant could contact these customers about his new employment with Salomon Smith Barney, Inc. ("Smith Barney").  Second, by soliciting business from Merrill Lynch customers following his resignation from Merrill Lynch.  The sheer nature and number of Defendant's contacts with

2

Merrill Lynch customers following his resignation shows that these contacts are solicitations in violation of his employment agreements.

Under well-settled law of the United States Courts of Appeals, Merrill Lynch is entitled to preliminary injunctive relief because Defendant specifically consented to the issuance of an injunction in the event he violated the terms of his employment agreements.  Moreover, Merrill Lynch has been irreparably harmed in three principal ways:  1) the damages Merrill Lynch will suffer are incalculable; 2) there will be damage to Merrill Lynch's customer goodwill due to the disclosure of confidential customer information without customer permission; and 3) there will be damages to the stability of Merrill Lynch's Cottonwood office.

Finally, Merrill Lynch is well within its rights in seeking injunctive relief from this Court.  This relief is expressly provided for in the parties' agreement to arbitration.  Moreover, the NASD Rules of Arbitration Procedure expressly provide for the right of a party to seek interim injunctive relief from a court of law pending arbitration.  Such relief is also consistent with the case law construing the Federal Arbitration Act.

## II.   DISCUSSION

### A.   MERRILL LYNCH DOES NOT SEEK TO ENJOIN DEFENDANT'S ACCEPTANCE OF BUSINESS; THEREFORE, THE MAJORITY OF THE ARGUMENTS RAISED IN DEFENDANT'S OPPOSITION PAPERS CAN BE SUMMARILY DISMISSED

The majority of the arguments raised in Defendant's opposition papers are premised upon Merrill Lynch seeking to enjoin Defendant from accepting account transfers.  These arguments are wholly irrelevant to the action before the Court because Merrill Lynch does not seek that relief.  Rather, the relief sought by Merrill Lynch, and the temporary restraining order granted by this Court, enjoined only Defendant's solicitation of business from the Merrill

3

Lynch customers he served or whose names became known to him while employed by Merrill Lynch, and required him to cease using and disclosing Merrill Lynch client information and return it to Merrill Lynch.

### 1.   Merrill Lynch Seeks Only To Make Defendant Comply With His Non-Solicitation Covenant

In consideration for the compensation and plethora of benefits and support provided by Merrill Lynch, Defendant signed a <u>Financial Consultant Employment Agreement and Restrictive Covenants</u> (the "Agreement"). <u>See</u> Exhibit "A" to Merrill Lynch's Complaint. Among other things, the Agreement contains covenants prohibiting the use and disclosure of confidential Merrill Lynch customer information and trade secrets for purposes other than doing business for Merrill Lynch.[1] Significantly, the Agreement also contains a one year non-solicitation covenant. <u>See</u> Exhibit "A" to Merrill Lynch's Complaint at ¶ 2 (emphasis added in part).

In this action, Merrill Lynch seeks only to enforce the non-solicitation covenant contained in paragraph two of Defendant's Agreement. Defendant's reliance on the law of non-compete covenants is misplaced. Put simply, Merrill Lynch is not seeking to enforce a non-compete covenant. Merrill Lynch is seeking only to enforce the non-solicitation covenant contained in paragraph two of the Agreement. A non-solicitation covenant is completely different from a non-compete covenant in that the non-compete covenant typically prevents a former employee from competing with the former employer in the same industry in a specific geographical area for a specific period of time. By contrast, the non-solicitation covenant

---

[1] Defendant also entered three additional agreements which further confirmed the confidentiality of Merrill Lynch's customer information and prohibited the use or disclosure of such information. (<u>See</u> Exhibits "B" – "D" to Merrill Lynch's Complaint).

contained in paragraph two of Defendant's Agreement contains none of these restrictions. Defendant is still able to work in the securities industry. In fact, Defendant can even work for a direct Merrill Lynch competitor in the same geographical area. See Merrill Lynch v. Napolitano, 85 F. Supp.2d 491, 497-98 (E.D. Pa. 2000).

Moreover, the non-solicitation covenant contained in Defendant's Agreement is narrowly tailored to protect Merrill Lynch's business interests in maintaining the confidentiality of information given to it by customers in confidence, information to which Defendant had access during his Merrill Lynch employment. See Merrill Lynch v. Stidham, 658 F.2d 1098, 1101 (5th Cir. Unit B 1981) ("But to draft a narrow contract that includes a promise not to solicit from "clients of Merrill Lynch whom I served or whose names became known to me while in the employ of Merrill Lynch," represents an exemplary attempt to identify a potential drain of corporate training resources and to respond with no more contractual adhesion than necessary.").

Therefore, Defendant misses the mark in relying upon cases such as BDO Seidman v. Hirschberg, 93 N.Y.2d 382 (N.Y. 1999), which address non-compete covenants.[2] In BDO Seidman, the New York Court of Appeals considered a non-compete agreement that broadly prohibited the former employee from doing business with any customer of the company's Buffalo office, regardless of whether the customer came to him on an unsolicited basis, and regardless of whether the defendant had serviced the customer or learned anything about the customer during his employment. In sharp contrast, Merrill Lynch is requesting, and

---

[2] In BDO Seidman, an employer was seeking damages against a former employee based on a contractual provision that provided for liquidated damages if the employee served any former client of the employer's Buffalo office during the eighteen month period following the employee's resignation. See BDO Seidman, 93 N.Y.2d at 387-88. The Court of Appeals analyzed this contractual provision as a non-compete covenant.

Defendant's contract specifically provides, that Defendant be prohibited from soliciting only the Merrill Lynch customers he served or whose names he learned while employed at Merrill Lynch. Defendant is not prevented from doing business with Merrill Lynch customers who come to him on their own volition. Moreover, the injunction sought in this case would not prevent Defendant from accepting business from any Merrill Lynch customer whether or not he has, or will, solicit them.[3]

    2.    **The Public Interest and the Balancing of the Harm Weigh Heavily in Merrill Lynch's Favor**

        a.    **An Injunction Would Serve the Public Interest**

Similarly, Defendant's argument about the public interest is premised on an injunction enjoining acceptance of business. Since Merrill Lynch has only sought to enjoin solicitation of business, this argument can also be disregarded.

Defendant's argument that Merrill Lynch customers have a right to know of his new employment is both moot and contradictory. Almost immediately after Defendant's resignation, the customers accounts that Defendant had serviced were re-distributed to the other Financial Advisors in the office. Merrill Lynch both orally and in writing directed all Financial Advisors in the Cottonwood branch office to advise customers of Defendant's new employment with Smith Barney if the customers request such information. <u>See</u> Financial Advisor Memo attached as Exhibit "D" to the Affidavit of Robert Carson. Therefore, Merrill Lynch gave customers information about Defendant's new employment *if they wanted that information.*

---

[3] Furthermore, the plaintiff in <u>BDO Seidman</u> had not presented or even alleged "any evidence that the defendant actually solicited former clients," <u>BDO Seidman</u>, 93 N.Y.2d at 388, whereas in this case there is evidence that Defendant solicited customers by both mail and telephone contacts. <u>See</u> Affidavit of Robert Carson and Affidavit of Russell K. Cannon previously submitted to the court.

Defendant knew this since Merrill Lynch takes this action each time a Financial Advisor resigns or is terminated.  Nevertheless, Defendant took it upon himself to contact Merrill Lynch customers under the guise that they would have no way of knowing where he was now employed.

Furthermore, Defendant contacted Merrill Lynch customers by both mail and telephone regarding his new employment.  In other words, Defendant gave Merrill Lynch customers "notice" of his new employment not only once, but twice (not to mention the notice provided by Merrill Lynch).  However, by the time of Defendant's second contact, the notice issue was moot.  Defendant had already given customers information regarding his new employment with Smith Barney.  Regardless of the words used in Defendant's communications, his purpose behind the contacts was not to give information, but to solicit business.  Defendant's own actions contradict his alleged purpose in contacting Merrill Lynch customers.  (See Section II(B) below for more a fuller discussion on this issue).

Furthermore, injunctive relief preventing Defendant from further soliciting any business from Merrill Lynch customer, or initiating any further contact with Merrill Lynch customers, will harm neither Defendant nor Merrill Lynch customers.  Under Defendant's own analysis of "information contacts" (with which Merrill Lynch disagrees), Defendant has already given Merrill Lynch customers the information he claims they are entitled to.  Therefore, granting Merrill Lynch injunctive relief in this case will harm neither Defendant nor Merrill Lynch customers.

Defendant's resistance to injunctive relief reveals his real strategy.  As laid out in the Affidavit of Robert Carson previously submitted to the court, Defendant had worked with two other Merrill Lynch Financial Advisors as part of a team.  Merrill Lynch is gravely

concerned that Defendant is going to solicit business from the customers serviced by the other

two Financial Advisors.  Since the customers previously serviced by Defendant have already

received notice of his new employment, Merrill Lynch believes that Defendant wants to be able

to continue contacting Merrill Lynch customers so he can solicit the customers serviced by the

other two Financial Advisors.  Clearly, there is no so-called "broker-client" relationship between

Defendant and these other customers as they were developed and cultivated by the other two

Financial Advisors on the team.[4]  Accordingly, Defendant has no reason to, and should not be

permitted, to contact these other customers.

---

[4] Defendant's citation to Prudential Securities v. Plunkett, 8 F. Supp.2d 514 (E.D. Va. 1998),
regarding the broker-client relationship is misleading.  First, the decision in Plunkett relied upon
the lower court's decision in American Express Financial Advisors v. Thorley, 971 F. Supp. 780
(W.D.N.Y. 1997), which was **reversed by the United States Court of Appeals for the Second
Circuit,** see 147 F.3d at 229 (1998).  In addition, there are numerous factual differences between
this case and Plunkett, the most glaring of which perhaps is that Plunkett applied New York law
pursuant to a clause in Prudential's contract, whereas this case is governed by Utah law.
Moreover, even if New York law were applicable, Merrill Lynch's contract -- unlike Prudential's
-- has repeatedly been upheld by the New York Appellate Division in cases virtually identical to
this case.  See, e.g., Leake v. Merrill Lynch, 623 N.Y.S.2d 220, 221 (N.Y. App. Div. 1995)
(holding that it was an abuse of discretion for the lower court not to issue a preliminary
injunction enforcing Merrill Lynch's nonsolicitation covenant pending arbitration).  Finally,
Defendant fails to mention that there was no evidence of solicitation by Plunkett, unlike the case
here. 8 F.Supp.2d at 519.
        Furthermore, Defendant relies upon outdated authority from Georgia, Michigan and
Florida in addressing the broker-client relationship.  Merrill Lynch v. de Liniere, 572 F. Supp.
246 (N.D. Ga. 1983), has been rejected by numerous subsequent decisions from Georgia federal
courts.  See, e.g., Merrill Lynch v. Schwartz, 1998 WL 55241 (M.D. Ga. February 5, 1998);
(granting injunction against broker hired by J.C. Bradford); Merrill Lynch v. Rowell, No. 91-
17D-2-MAC (WDO) (M.D. Ga. 1991) (Exhibit "A" hereto); Merrill Lynch v. Hardegree,
No.1:95-cv-206-3 (WLS) (M.D. Ga. 1995) (Exhibit "B" hereto); Merrill Lynch v. Brambila, No.
92-346-1-MAC(DF) (M.D. Ga. 1991) (Exhibit "C" hereto).  Similarly, Merrill Lynch v. E.F.
Hutton & Co., 403 F.Supp. 336 (E.D. Mich. 1975), has been rejected by subsequent decisions
from the Michigan federal courts.  See, e.g., Orbach v. Merrill Lynch, 1994 WL 900431 (E.D.
Mich. 1994); Merrill Lynch v. Grall, 836 F. Supp. 428 (W.D. Mich. 1993); Merrill Lynch v.
Barnett, 1990 WL 303428 (W.D. Mich. 1990).  Likewise, Merrill Lynch v. McCullen, No. 95-
14329 (S.D. Fla. 1995), has not been followed even by other Florida federal courts.  See, e.g.,
Merrill Lynch v. Pease, No. 96-667-CIV-NESBITT (S.D. Fla. 1996) (Exhibit "D"); Merrill

Defendant conveniently characterizes every Merrill Lynch customer as one with whom he has built a trust and who would follow him to Smith Barney. This is not necessarily the case. Some customers will keep their accounts with Merrill Lynch because of the products and services Merrill Lynch has to offer. Other customers will keep their accounts with Merrill Lynch because of its long-standing reputation for quality service. These customers could care less which Financial Advisor services their accounts. In effect, Merrill Lynch customers have the right to make an informed decision as to where they want to keep their assets. Defendant, by contrast, would like Merrill Lynch customers to make a snap decision to follow him based on his hurried campaign of mailings and telephone calls. What he is most probably not telling these Merrill Lynch customers is that Smith Barney is paying him substantial amounts of money to solicit their business. Defendant should not be allowed to do this as it is not in the customers' best interests. Defendant has already informed Merrill Lynch customers of his new employment with Smith Barney. Now it is the customers' choice to stay with Merrill Lynch or to transfer their accounts to Smith Barney. The injunction sought by Merrill Lynch will not prevent this from occurring.

### b. The Balancing of the Harm Weighs in Favor of Granting an Injunction

Defendant's argument that his livelihood is being harmed is specious. Defendant is free to contact new clients, with the exception of the Merrill Lynch clients he formerly serviced or whose names became known to him while employed by Merrill Lynch. Moreover, Defendant is free to accept business from any client.

---

Lynch v. Yuster, No. 96-8557 (S.D. Fla. 1996) (Exhibit **"E"**). Moreover, at the time of the McCullen decision, the NASD rules did not provide for injunctive relief in Court as the current NASD rules do.

9

For the court to accept Defendant's proposition about the "little guy" versus the "big corporation" would mean that a corporation could never get an injunction issued against a former employee. That is simply not the case. Arguments by Defendant in this regard are without merit and have been rejected by courts around the country. In Merrill Lynch v. Stidham, for example, the United States Court of Appeals for the Fifth Circuit rejected this very argument:

> More **specious** is defendant's argument that because Merrill Lynch is a large concern, the injury is minuscule. One cannot be certain, but the success of Merrill Lynch may well be attributable to its diligence over the years in **holding parties to the contracts that they freely executed**. Today, they seek to do no more.

658 F.2d at 1101, n.8 (citations omitted) (emphasis added). See also Ferrero v. Associated Materials, Inc., 923 F.2d 1441, 1449 (11th Cir. 1991) (11th Circuit reiterates and reaffirms Stidham, stating that "this Court has held 'specious' an argument suggesting that, in deciding this element of the preliminary injunction calculus, the court ought to compare the actual losses sustained to the size of the company."); Ruscitto v. Merrill Lynch, 777 F. Supp. 1349, 1352-54 (N.D. Tex.), aff'd, 948 F.2d 1286 (5th Cir. 1991) ("The court determines next that the threat of injury to Merrill Lynch outweighs the threat of injury to Ruscitto. The court rejects the facile temptation simply to compare the corporate employer with the individual former employee and to balance the harm only with reference to their correlative financial standing. **To do so would almost always dictate a ruling against the corporate behemoth.**") (emphasis added).

Furthermore, granting Merrill Lynch preliminary injunctive relief in this case would promote the public interest in the protection of the investment made by businesses in the development of their companies, and the public interest in the enforcement of fiduciary duties and reasonable contracts. Moreover, an injunction would protect Merrill Lynch's highly sought

after client list from competitors such as Smith Barney, and the confidentiality of those clients' records.   An injunction would also discourage competitors like Smith Barney from inducing Merrill Lynch employees to breach their fiduciary and contractual duties in exchange for financial inducements and convert Merrill Lynch's trade secrets and other confidential property.

By contrast, Defendant has deliberately breached his obligations to Merrill Lynch and has misappropriated Merrill Lynch's trade secrets.  Defendant's arguments of his inability to earn a living are especially specious in light of the fact that Defendant probably received substantial upfront monies, restricted CitiGroup stock, and deferred compensation as part of his compensation package from Smith Barney, monies which far exceeded his annual 2000 Merrill Lynch compensation.  In reality, Merrill Lynch's injunction will <u>not</u> prevent Defendant from earning his living at the same trade, even with a competitor, and without any delay, so long as it is not done with Merrill Lynch customers.  Merrill Lynch merely wants to preserve the *status quo* by preventing Defendant from further soliciting its customers.

### 3.    NASD Proposed Rule Interpretation

The NASD proposed rule interpretation has no bearing on this action.  First and foremost, the NASD proposed rule interpretation deals with "court orders that have the effect of preventing customers from transferring their accounts to follow a registered representative to his or her new employer." <u>See</u> Exhibit **"F"** hereto, Executive Summary at p. 1.  This is not an issue in this case as the relief sought by Merrill Lynch, and the relief granted by this Court, does not prevent Defendant and/or Smith Barney from accepting account transfer requests from Merrill Lynch customers.  In fact, the Temporary Restraining Order provides that "[n]othing in this Order shall prevent Defendant from communicating with, **or accepting any business from,** any Client who has previously advised Defendant or Smith Barney of the Client's intention to

transfer their Merrill Lynch account to Smith Barney." See Temporary Restraining Order attached as Exhibit **"G"** hereto at ¶ 4 (emphasis added). Therefore, the injunctive relief sought in this case in no way interferes with the transfer of customer accounts.

Furthermore, the NASD proposed rule interpretation is just that: a suggestion or a proposal. It is nothing more than a proposal that is still subject to public comment at the NASD and SEC. See Sweet v. Sheahan, 235 F.3d 80, 87 (2d Cir. 2000) ("[P]roposed regulations . . . have no legal effect" and "are suggestions made for comment; they modify nothing.") (citations omitted); Merrill Lynch v. Donnelly, No. 3:01CV423 (E.D. Va. 2001) (Exhibit **"H"**) ("While the Court is aware that the NASD has proposed a rule that would allow transfer of accounts solicited in violation of employment contracts, until that rule is given full force and effect by the NASD, this Court will enforce the employment agreements freely entered into by the defendants."). Moreover, Merrill Lynch's experience is that NASD proposed regulations frequently undergo substantial change by the time they are finalized, if ever. For example, one such case involved a proposal to restrict NASD member firms (such as Merrill Lynch and Smith Barney) from filing in Court to seek interim injunctive relief. After rejecting the proposed rule, the NASD ultimately implemented a rule giving firms the express right to seek injunctive relief in Court (Rule 10335), and there is now a proposed NASD rule making clear that firms can seek interim injunctive relief in court alone and nowhere else. Suffice it to say, the current proposed rule interpretation will very likely change substantially and, in any event, is wholly irrelevant to this action.[5]

---

[5]Contrary to Defendant's representation, an injunction prohibiting acceptance of wrongfully solicited business would not be in conflict with NASD Rule 11870 and NYSE Rule 412. See Merrill Lynch v. Mundrane, No. 98 C 6382 (N.D. Ill. 1998) (Exhibit "__" hereto) ("Finally, the Court rejects Defendant's assertion that the mechanical rules of account transfers as established by the NASD somehow prevent the Court from enjoining the acceptance of improperly solicited business or from enforcing Defendant's consent to injunctive relief. Court orders prevail over

In any event, the relief sought by Merrill Lynch in this case is wholly *consistent* with the NASD proposed rule interpretation. The NASD proposed rule interpretation specifically provides that it "would not restrict the ability of member firms to use employment agreements to prevent former representatives from soliciting firm customers. Similarly, the proposal would not prevent a firm from enforcing employment agreements with former representatives." See Exhibit **"F"** hereto, Discussion at p. 3. By seeking only to enjoin Defendant's solicitation of business, Merrill Lynch has acted in a manner fully consistent with the NASD proposed rule interpretation. Therefore, Defendant's arguments concerning this issue are without any basis.

**B.  DEFENDANT VIOLATED HIS AGREEMENT TWICE: FIRST, BY TAKING CUSTOMER NAMES FOR A NON-RELATED MERRILL LYNCH BUSINESS PURPOSE AND SECOND, BY THEN USING THIS INFORMATION TO SOLICIT MERRILL LYNCH CUSTOMERS**

**1.  Defendant Violated His Agreement by Taking Customer Names For a Non-Related Merrill Lynch Business Purpose**

It is undisputed that Defendant's Agreement controls the resolution of this dispute. In his Agreement, Defendant explicitly agreed that customer names, among other information, were the trade secrets and sole property of Merrill Lynch. Defendant further agreed

---

such regulatory items. Any other interpretation would unreasonably circumscribe the Court's equitable powers."); Merrill Lynch v. Rodger, 75 F. Supp.2d 375, 379 (E.D. Pa. 1999) (the court rejected the argument that the NASD Rules prevent a court from enjoining acceptance of wrongfully solicited business by noting that the rules "operate between the brokerage and its customers, not the brokerage and its employees."). Moreover, in this year alone, two NASD arbitration panels have granted injunctive relief prohibiting acceptance of business from wrongfully solicited customers. See Merrill Lynch v. Coleman and UBS PaineWebber, Inc., Case No. 01-01822 (NASD 2001) (granting Merrill Lynch a one year injunction including prohibiting acceptance of business) (Exhibit **"I"** hereto); Merrill Lynch v. Calise and Salomon Smith Barney, Case No. 01-00784 (consolidated with 01-00846) (NASD 2001) (same) (Exhibit **"J"** hereto).

that he would not use this information for purposes other than conducting business for Merrill

Lynch.  See Exhibit "A" to Merrill Lynch's Complaint at ¶ 1.  Merrill Lynch conditioned its

employment of Defendant on his agreement to these terms.  Now, Defendant seeks to renege on

his promises even though Merrill Lynch has upheld its end of the bargain by provided Defendant

with compensation, benefits and support at all times.

Merrill Lynch's customer names are trade secrets for two principle reasons.  First,

Defendant expressly stipulated in his Agreement that customer names are the sole property of

Merrill Lynch and deserve trade secret status.  If Defendant had thought otherwise, he should

have not signed the Agreement or should have insisted on striking this language at the time he

signed the Agreement.

Second, courts from around the country have likewise held that customer

information is the trade secret property of Merrill Lynch given its extraordinary effort to compile

this information and its efforts to protect its confidentiality.[6]  Unlike the case of Microbiological

Research Corp. v. Muna, 625 P.2d 690 (Utah 1981), relied upon by Defendant, Merrill Lynch's

---

[6] See, e.g., Merrill Lynch v. Ran, 67 F.Supp.2d 764, 774 (E.D. Mich. 1999) ("Merrill Lynch is
entitled to trade secret protection under Michigan's Uniform Trade Secrets Act."); Merrill Lynch
v. Cross, 1998 WL 122780 at *2 (N.D. Ill. 1998) ("Customer lists are entitled to trade secret
protection under Illinois law."); Merrill Lynch v. Zimmerman, 1996 WL 707107 at *2 (D. Kan.
1996) ("[T]he Court concludes that the Documents improperly taken by the defendant constitute
a compilation within the meaning of V.A.M.S. § 417.453(4) . . . As a result, the Court concludes
that . . . the Documents constitutes a trade secret."); Orbach v. Merrill Lynch, 1994 WL 900431
at *6 (E.D. Mich. Jan. 11, 1994) ("The Michigan Court of Appeals . . . has held that Merrill
Lynch's client list is the property of Merrill Lynch . . . . [D]efendant has a strong likelihood of
success on the merits of this claim."); Merrill Lynch v. Hegarty, 808 F. Supp. 1555, 1558 (S.D.
Fla. 1991) (holding that Merrill Lynch "ha[s] a legitimate interest in the [customer] list because it
is a trade secret."); Merrill Lynch v. Kramer, 816 F. Supp. 1242, 1246 (N.D. Ohio 1992) ("Even
absent a specific contractual provision, Merrill Lynch's customer list is entitled to trade secret
protection under Ohio law."); Ruscitto v. Merrill Lynch, 777 F. Supp. 1349, 1354 (N.D. Tex.
1991), aff'd, 948 F.2d 128, cert. denied, 112 S.Ct. 1994 (1992) (emphasizing that injunctive

customer names and other information is not readily available from sources independent of Merrill Lynch documents.  In <u>MRC</u>, the plaintiff manufactured medial diagnostic kits.  The court held that since "[m]ost of the customers were clinical laboratories and hospitals, the location and identity of which were readily accessible through public sources and trade journals." <u>Id</u>. at 700. Here, by contrast, the identities of Merrill Lynch customers are not obtainable through a telephone book or trade journal.  One will not find next to an entry in a telephone book whether a person owns stock or mutual funds and with which securities firm.  Rather, the only means for Defendant to obtain this information was through his Merrill Lynch employment and from Merrill Lynch documents.  Defendant should not be permitted to take and use this trade secret information following his resignation for a purpose not related to Merrill Lynch.

Whether Defendant took Merrill Lynch documents physically or by memory does not matter.  First of all, Defendant's Agreement specifically states that "All records, whether . . . **memorized** . . . or in any other form, and all information, contained therein, including **names** . . . of any account, customer, client, customer lead or prospect ("Account"), are confidential and are the sole and exclusive property of Merrill Lynch." <u>See</u> Exhibit "A" to Merrill Lynch's Complaint at ¶ 1 (emphasis added).  Defendant also specifically agreed to use this information "for the sole purpose of conducting business on behalf of Merrill Lynch." <u>See</u> Exhibit "A" to Merrill Lynch's Complaint at ¶ 1.  Defendant's misappropriation of Merrill Lynch customer names by memory violates the express terms of his Agreement.

Defendant has no excuse for breaching his Merrill Lynch Agreement.  Any customer who wanted to contact him on an unsolicited basis could have done so.  Merrill Lynch instructed the other Financial Advisors in the Cottonwood office after Defendant's customer

relief is necessary to protect the "goodwill and trade secrets" of Merrill Lynch).

accounts were re-distributed to advise clients that Defendant was now employed by Smith Barney in Salt Lake City.  See Exhibit "D" to the Affidavit of Robert Carson.

Furthermore, Defendant's memorization of customer names was the means by which he was able to look up their addresses and telephone numbers in the telephone book, compile his list of customer contact information, and then contact customers by mail and telephone.  This list properly belongs to Merrill Lynch because Defendant would not have been able to compile the list had it not been for his learning of customer names (i.e., persons with the need and interest in receiving brokerage services) through his Merrill Lynch employment.  In other words, the list is derivative of Defendant's memorization of customer names.

Various courts around the country have agreed with Merrill Lynch's position that misappropriation occurs by both physical misappropriation and by memory.  See Ed Nowagroski Ins. v. Richer, 971 P.2d 936, 946-947 (Wash. 1999) (citing cases and holding that, "[w]hile customer lists may or may not be trade secrets depending on the facts of the case, we conclude that trade secret protection does not depend on whether the list is taken in written form or memorized."); Reusch v. Reusch Int'l Monetary Servs., Inc., 479 A.2d 295, 297 n.3 (D.C. App. 1984) ("[O]nce a customer list is afforded trade secret protection, it is immaterial whether the list was taken or copied or whether it was memorized."); Stampede Tool Warehouse v. May, 651 N.E.2d 209, 216-17 (Ill. App. 1995) ("That taking does not have to be physical taking by actually copying the names.  A trade secret can be misappropriated by physical copying or by memorization."); Allen v. Johar, Inc., 823 S.W.2d 824, 827 (Ark. 1992); Velo-Bind, Inc. v. Scheck, 485 F. Supp. 102, 107 (S.D.N.Y. 1979).

Therefore, Defendant's taking of customer names by memory is in itself a breach of Defendant's Agreement.

**2.      Defendant's Contacts with Merrill Lynch Customers Are Clear Solicitations In Violation of His Agreement**

This issue is also governed by Defendant's Agreement   Paragraph two (2) of

Defendant's Agreement states that:

> **My agreement "not to solicit" means that I will not, during my employment and for a period of one year thereafter, initiate any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting any Account:**
>
> **(a)      to transfer from Merrill Lynch to me or to my new employer, or**
>
> **(b)      to open a new account with me or with my new employer, or**
>
> **(c)      to otherwise discontinue its patronage and business relationship with Merrill Lynch.**

See Exhibit "A" to Merrill Lynch's Complaint at ¶ 2 (emphasis added).

The only duty Defendant has is to abide by his Agreement – this issue is not

governed by general principles or common law as Defendant suggests.  Notably, Defendant cites

no statute, rule or regulation charging him with his "duty" to inform client that he has changed

employers.  Rather, Defendant relies on case law, most of which is distinguishable from this

case.  For example, most the cases relied upon by Defendant involved only one contact with

Merrill Lynch customers, not two as in this case.  See, e.g., Merrill Lynch v. O'Connor, No.

1:00-cv-02065 (N.D. Ill. Apr. 12, 2000) (App. 11 to Defendant's Opposition Memorandum)

(only evidence of oral communications with a family member and long-standing friends); Merrill

Lynch v. Pinzker, No. 98 C 7979 (N.D. Ill. December 15, 1998) (App. 15 to Defendant's

Opposition Memorandum) (evidence of telephone calls only); Merrill Lynch v. Gurtin, No. 99 C

406 (N.D. Ill. Jan. 27, 1999) (App. 4 to Defendant's Opposition Memorandum) (same); Merrill

Lynch v. Fowler, No. CA 99-3000 JR (D.D.C. Nov. 15, 1999) (App. 25 to Defendant's Opposition Memorandum) (same); Merrill Lynch v. Schlender, No. 98-32079 (Mich. Cir. Ct. Oct. 16, 1998) (App. 23 to Defendant's Opposition Memorandum) (evidence of mailing only); Merrill Lynch v. Oblon, No. 99 C 5968 (E.D. Ill. 1999) (App. 10 to Defendant's Opposition Memorandum) (same). The sheer nature and number of Defendant's contacts with Merrill Lynch customers leads to the undeniable conclusion that his intent was to solicit them to transfer their accounts to Smith Barney.

        In effect, Defendant offers an incorrect analysis of his conduct under his Agreement. Defendant focuses on the content of his conduct, rather than the *intent* or *effect* of his conduct, which is referenced by the Agreement. The purpose of Defendant's conduct is obvious: to solicit business. Why else would Defendant seek to "inform" Merrill Lynch customers of his new employment, especially when Defendant knows that it is Merrill Lynch's policy after a Financial Advisor resigns to inform customers of his new employment if asked for this information. See Memorandum attached as Exhibit "D" to the Affidavit of Robert Carson. Furthermore, Smith Barney would not spend money on announcements if it were not for some hope of pulling customers away from Merrill Lynch. See Merrill Lynch v. Akre, No. 00-CV-003500 (Wisc. Cir. Ct. 2000) (Exhibit **"K"** attached to Merrill Lynch's initial Memorandum of Law trans. at pp. 8-9, and 11) ("Dean Witter would not spend money on announcements to give Merrill Lynch customers information regarding their brokers, unless that company had some hope of pulling the customer away from Merrill Lynch. A company would not spend money for the sole purpose to give the information to the customers of another brokerage house.").

        In fact, Defendant undermines his own argument about "informational contacts" by the sheer fact that he contacted Merrill Lynch customers not once, but twice, regarding his

new employment with Smith Barney.  If Defendant knew he was going to send out his "tombstone" announcements to Merrill Lynch customers containing his new place of employment, there would have been no need for him to also contact Merrill Lynch customers by telephone.  Under Defendant's own analysis of "informational contacts," he already gave Merrill Lynch customers the information he claims he owed to them.

Defendant's obvious intent in contacting Merrill Lynch customers by telephone was to create a two-way communication whereby the customers would feel compelled to ask about his new place of employment.  Numerous courts throughout the country have recognized the concealed purposed behind these so-called "informational" telephone calls.  See Merrill Lynch v. Sivel, No. MJG-99-185 at 9 (D. Md. 1999) (Exhibit "L" to Merrill Lynch's Initial Memorandum of Law) ("If not, what purpose was there to the telephone calls?  In the best reasonable light (for Sivel), the calls must have been made to put the customer in a position to ask Sivel about the Merrill Lynch account and the prospects of going with Sivel to Dean Witter."); Merrill Lynch v. Amsbury, No. CIV00-232-S-MHW (Order Expanding TRO and transcript of 5/8/00 hearing at 3) (D. Idaho 2000) (Exhibit "M" to Merrill Lynch's initial Memorandum of Law) ("Likewise, the initiation of phone calls are clearly in solicitation of business.  I don't know how one could end a phone call advising a customer of the changed relationship without a solicitation occurring.  I think in the real world it is impossible."); Merrill Lynch v. Kearney, No. 01-5022 at 6-7 (W.D. Ark. Jan. 25, 2001) (Exhibit "N" to Merrill Lynch's Initial Memorandum of Law) ("Regardless of how such telephone contacts are characterized or what, precisely, was involved therein, the Court cannot escape the conviction that they were solicitations in the context of the matter at hand.  Leaving aside definitions of the word which clearly do not apply in this context, "solicit" means "to move to action" or "to serve

as an urge or incentive."). In fact, these courts have all held that targeted contacts at Merrill Lynch customers constitute solicitations in violation of the same non-solicitation clause that is at issue here.

Merrill Lynch has a significant and legitimate business interest in prohibiting Defendant from initiating any further contact with Merrill Lynch customers. Customers are the lifeblood of Merrill Lynch's business. Merrill Lynch has spent considerable amounts of money through the years developing a client base by training Financial Advisors like Defendant to properly service customers, acquiring adequate facilities within which Financial Advisors can work and meet with clients, and providing Financial Advisors with access to and use of experts in asset management, tax, estate planning and insurance as well as promotional marketing and sales support. A Financial Advisor like Defendant would not have been able to give customers the quality of service he did had it not been for the resources provided by Merrill Lynch. Clearly, Merrill Lynch has a significant business interest in stopping Defendant from using the information he gained during his Merrill Lynch employment to further contact Merrill Lynch customers about his new employment with a direct competitor like Smith Barney.

Therefore, Defendant should be enjoined from initiating any further contact with Merrill Lynch customers. Even under this own arguments, he has fulfilled his so-called "obligation" to inform customers of his new employment. No proper purpose would be attained by allowing Defendant to continue his contacts with Merrill Lynch customers.

## C.   DEFENDANT'S CONDUCT WILL CAUSE MERRILL LYNCH IRREPARABLE HARM

As a threshold matter, the Court need not even consider the traditional prerequisites for injunctive relief. Since Defendant specifically consented to the issuance of

20

interim injunctive relief in the event of a breach of his contractual obligations, Merrill Lynch is

not required to prove irreparable harm. For example, in Peabody Coalsales v. Tampa Electric,

36 F.3d 46 (8th Cir. 1994), the Eighth Circuit held that where, as here, a party has consented to

continued performance of contractual duties pending a decision on the merits in arbitration, the

district court must give effect to this term of the contract as a substantive term of the parties'

agreement to arbitrate:

> In this case, the bargained-for terms of the Agreement require
> continued performance as part of the dispute resolution process.
> Thus, an order compelling arbitration "in accordance with the terms
> of the agreement" must necessarily include an order requiring
> continued performance.
>
> This result is consistent with the congressional purpose to avoid
> court delays. **Where, as here, the contract clearly requires
> continued performance during the arbitration process, the
> judicial inquiry is limited and arbitration under the contract
> terms will not be delayed. The court need only read the
> contract and order arbitration according to its provisions.** . . .
>
> **In light of the above, we disagree with Tampa Electric's
> assertion that a showing of irreparable harm is necessary to
> support an order requiring performance pending arbitration.**
> Though some other circuits have required such a showing, they did
> so under circumstances not implicating this court's heightened
> concern with avoiding the merits of the underlying dispute. It
> would be inconsistent with [Merrill Lynch v.] Hovey [726 F.2d
> 1286 (8th Cir. 1984)] to delay the arbitration proceedings by
> requiring an evidentiary hearing in district court on the existence of
> irreparable harm or the other standard criteria for the grant of
> preliminary injunction.

Peabody, 36 F.3d at 48 (emphasis added) (footnotes omitted).

Similarly, in RGI, Inc. v. Tucker & Associates, Inc., 858 F.2d 227 (5th Cir. 1988),

the Fifth Circuit found that where the parties contractually agree to the issuance of a preliminary

injunction pending arbitration, "the court need not involve itself in balancing the various factors

to determine whether a preliminary injunction should be issued." <u>Id.</u> at 230. "This bargained-for provision [<u>i.e.</u> the consent to injunctive relief] clearly contemplates that the status quo is to continue pending arbitration." <u>Id.</u>

The Tenth Circuit's holding in <u>Merrill Lynch v. Dutton</u>, 844 F.2d 726 (10th Cir. 1988), is like that of <u>RGI</u> and <u>Peabody</u>. In finding that Merrill Lynch had the right to seek interim injunctive relief from a court pending arbitration as opposed to the NASD, the <u>Dutton</u> court relied almost exclusively on the defendant's employment agreement with Merrill Lynch. "[P]laintiff is entitled by the employment contract to the entry of orders protecting the status quo until the merits of its dispute with its former employee can be resolved." <u>Id.</u> at 727-28. Thus, like the <u>RGI</u> and <u>Peabody</u> courts, the <u>Dutton</u> court limited its inquiry to a reading of the contract terms. Since the defendant in that case consented to injunctive relief pending arbitration in his employment agreement, the <u>Dutton</u> court upheld the issuance of the preliminary injunction on that basis.[7]

Furthermore, the agreements for preliminary injunctive relief enforced by the Fifth and Eight Circuits in <u>RGI</u> and <u>Peabody</u> were much less explicit that the corresponding provision in the Agreement here between Merrill Lynch and Defendant. The parties' agreement in <u>RGI</u> merely stated that in the event the parties submitted a dispute to arbitration, "this subcontract shall continue in full force and effect until such decision is rendered. . . ." <u>RGI</u>, 858 F.2d at 230. Likewise, in <u>Peabody</u>, the parties' agreement provided that performance "shall be

---

[7] Contrary to Defendant's representation, the court in <u>Merrill Lynch v. Rodger</u>, 75 F.Supp.2d 375 (M.D. Pa. 1999), did not hold that contractual stipulations to injunctive relief are unenforceable. Rather, the <u>Rodger</u> court held that it would rely upon the traditional four-prong standard in granting injunctive relief rather than mere proof that a breach of contract had occurred. <u>Id.</u> at 379-80. The same is true for <u>Advent Electronics, Inc. v. Buckman</u>, 112 F.3d 267, 274 (7th Cir. 1997).

continued in full by the parties during the dispute resolution process." <u>Peabody</u>, 36 F.3d at 47. By contrast, the Agreement between Merrill Lynch and Defendant explicitly provides that Merrill Lynch is entitled to a preliminary injunction pending the outcome of any arbitration proceeding. <u>See</u> Exhibit "A" to Merrill Lynch's Complaint at ¶ 4. Therefore, Defendant specifically and unambiguously consented to the relief sought by Merrill Lynch in this case.

Moreover, Merrill Lynch will be irreparably harmed in three principles ways. (<u>See</u> Merrill Lynch's Initial Memorandum of Law in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction for a fuller discussion on this issue). First, the damages Merrill Lynch will suffer are incalculable. The Tenth Circuit implicitly made this finding in <u>Merrill Lynch v. Dutton</u>, 844 F.2d 726, 727-28 (10th Cir. 1988), by issuing a temporary restraining order under nearly identical circumstances. It is nearly impossible to determine the number of clients who will be pirated away by Defendant's actions. Moreover, there is no way to determine with any degree of certainty the commissions each of these Merrill Lynch clients will generate not only this year, but <u>5, 10 or 20 years into the future</u>. Nor is it possible to determine the number of referrals that would be generated by these accounts. <u>See</u> <u>Equifax Services, Inc. v. Hitz</u>, 905 F.2d 1355, 1361 (10th Cir. 1990) (affirming the finding of irreparable harm from potential loss of customer because "'it is impossible to precisely calculate the amount of damage [plaintiff] will suffer.'"); <u>Merrill Lynch v. Stidham</u>, 658 F.2d 1098, 1102 (5th Cir. 1981) ("Were defendants permitted by the law to exploit the clientele of their former employers, every investment that reasonably flowed from the exploitation should be included in the damages award. How such a figure could be arrived at escapes us."); <u>Merrill Lynch v. Bradley</u>, 756 F.2d 1048, 1055 (4th Cir. 1985) (finding that Merrill Lynch "faced irreparable non-compensable harm in the loss of its customers.").

Moreover, numerous NASD arbitration panels over the years have issued injunctions (albeit enjoining acceptance of business) in addition to damages awards. Therefore, any harm to Merrill Lynch cannot be fully compensated by a damages award in arbitration, as Defendant suggests. See, e.g., Merrill Lynch v. Coleman, No. 01-01822 (NASD 2001) (Exhibit "I" hereto) (enjoining acceptance of business for full one year term of contract); Merrill Lynch v. Calise and Salomon Smith Barney, No. 01-00784 (consolidated with 01-00846) (NASD 2001) (Exhibit "J" hereto) (same); Merrill Lynch v. Bass & Dean Witter, 1999 WL 1047013 (NASD 1999) (Exhibit "O" hereto) (enjoining acceptance of wrongfully solicited business for one year duration of contract); Merrill Lynch v. Straight, 1999 WL 1485501 (NASD 1999) (Exhibit "P" hereto) (6 month permanent injunction prohibiting acceptance of wrongfully solicited business); Merrill Lynch v. Dufour, 1999 WL 1485504 (NASD 1999) (Exhibit "Q" hereto) (same); SunTrust Securities v. PaineWebber, 1999 WL 1485487 (NASD 1999) (Exhibit "R" hereto) (same); Merrill Lynch v. Nicholson, 1996 WL 914356 (1996) (Exhibit "S" hereto) (one year injunction, including injunction prohibiting acceptance of wrongfully solicited business).

Second, there will be damage to Merrill Lynch's customer goodwill due to the disclosure of confidential customer information without customer permission. Utah courts have recognized that restrictive covenants that protect employer goodwill are valid. See System Concepts, Inc. v. Dixon, 669 P.2d 421 (Utah 1983) (court held **two year** restrictive covenant barring cable television sales manager from competing with customers of former employer was reasonable despite the fact that it did not contain a territorial limitation). Here, Merrill Lynch stands to lose substantial goodwill since certain customers may be appalled at Defendant's misappropriation of confidential information entrusted to Merrill Lynch and use of that information to solicit their business at another securities firm. See Merrill Lynch v. Kramer, 816

F. Supp. 1242, 1247 (N.D. Ohio 1992) ("Plaintiffs argue with equal strength that irreparable and immeasurable harm lies in the fact that Merrill Lynch clients, when they discover that their financial information, market transactions, and investment assets which they presumed were held in confidence have been disclosed, will lose trust and confidence in Merrill Lynch."); Merrill Lynch v. Ran, 67 F.Supp.2d 764, 779 (E.D. Mich. 1999) ("The goodwill of Merrill Lynch is an invaluable intangible which, despite defendants' protestations to the contrary, is not easily quantified.  Given the complexities and uncertainties of developing a client base, unless injunctive relief is granted now, the impact of defendants' breaches on Merrill Lynch simply cannot be measured.").

Third, there will be damage to the stability of Merrill Lynch's Cottonwood, Utah office.  Allowing Defendant to unilaterally breach his Merrill Lynch Agreement will provide incentive to direct competitors like Smith Barney to pay other Merrill Lynch Financial Advisors significant sums of money to misappropriate confidential Merrill Lynch customer information and solicit Merrill Lynch customers in violation of their employment agreements. See Merrill Lynch v. Kramer, 816 F. Supp. 1242, 1247 (N.D. Ohio 1992) ("[I]njunctive relief is required to protect [Merrill Lynch] from similar conduct by other employees and to discourage competitor firms . . . from paying such employees large sums of money to induce them to breach their contracts, to confiscate confidential client records and to direct those clients to the competitor.").[8]

---

[8] The Fourth, Fifth, Seventh, and Eleventh Circuits all have also specifically held that Merrill Lynch will suffer irreparable harm in the absence of injunctive relief.  See Merrill Lynch v. Bradley, 756 F.2d 1048 (4th Cir. 1985), Ruscitto v. Merrill Lynch, 777 F. Supp. 1349 (N.D. Tex.), aff'd, 948 F.2d 1286 (5th Cir. 1991), cert. denied, 112 S.Ct. 1994 (1992); Merrill Lynch v. Salvano, 999 F.2d 211 (7th Cir. 1993); Merrill Lynch v. Hegarty, 808 F. Supp. 1555 (S.D. Fla.), aff'd, 2 F.3d 405 (11th Cir. 1993).

In this regard, Defendant wholly misconstrues <u>Automated Marketing Systems,</u>

<u>Inc. v. Martin</u>, 467 F.2d 1181 (10th Cir. 1972), a case that arose out of the United States District

Court for the District of Colorado. In that case, the Tenth Circuit held that the employer failed to

sign the employment agreement thereby rendering it unenforceable. <u>Id.</u> at 1183. Even if the

employer had executed the employment agreement, the Tenth Circuit questioned its

enforceability since the term of the employment agreement had already expired by the time of

the defendant's alleged wrongdoing. <u>Id.</u> Moreover, the court found that there was no showing

of irreparable harm since the plaintiff had distributed an annual report that concluded that the

former customers who tried a competitor's service "would soon be won back." <u>Id.</u> Thus, the

statement from that case relied upon by Defendant in his opposition papers, that "if customers

had been obtained in violation of a restrictive covenant . . . the remedy of law will still give

[Plaintiff] adequate resource," was in reliance on the plaintiff's assurances the customer would

return and the loss of business would be for a limited, identifiable time. <u>Id.</u> at 1183-84. Quite

conveniently, Defendant omitted the language in the middle of that sentence (noted by the

ellipses) which read, "if a valid covenant did exist." <u>Id.</u> at 1184.

### D. MERRILL LYNCH IS WITHIN ITS CONTRACTUAL AND STATUTORY RIGHTS IN SEEKING INJUNCTIVE RELIEF FROM A COURT OF LAW

Contrary to Defendant's unsupported assertions, Merrill Lynch has rightfully

brought its request for emergency injunctive relief to the right forum. Defendant's argument is

an attempt to have the Court abdicate its clear jurisdiction under the Federal Arbitration Act, 9

U.S.C. §§ 3-4 ("FAA"), the parties' agreement to arbitrate, and the NASD Code of Arbitration

Procedure. First of all, Rule 10335 of the NASD Code specifically addresses the means by

which parties to NASD arbitration agreements may seek emergency injunctive relief in arbitrable

disputes.  See Exhibit **"T"** hereto.  Rule 10335 states that parties to NASD arbitrations may seek injunctive relief "either within the arbitration process **or from a court of competent jurisdiction.**"  Id. (emphasis added).  See also American Express Financial Advisors v. Thorley, 147 F.3d 229 (2d Cir. 1998) (reversing the district court's decision not to hear the merits of a preliminary injunction motion pending arbitration); American Express Financial Advisors Inc. v. Makarewicz, 122 F.3d 936, 940 (11th Cir. 1997) (same).

Second, Defendant expressly consented in his Agreement to the issuance of a temporary restraining order and preliminary injunction to prohibit the breach of his Agreement and to preserve the *status quo* pending the outcome of any arbitration that might be initiated by the parties.  See Exhibit "A" to Merrill Lynch's Complaint at ¶ 4.  The 10th Circuit, having appellate jurisdiction over this Court, specifically held that a provision like this one providing for interim injunctive relief pending arbitration is a specifically enforceable term of the parties' agreement to arbitrate which must be given effect in order that the parties' agreement to arbitrate is carried out as written.

> **First, plaintiff is entitled by the employment contract to entry of orders protecting the status quo until the merits of its dispute with its former employee can be resolved.**  Whether the forum for such relief is in the first instance a court or an arbitration panel is left open by the terms of the contract.  **Thus, Merrill Lynch's resort to the district court was within its contractual rights.**  The entry of the temporary restraining order was appropriate.

Merrill Lynch v. Dutton, 844 F.2d 726, 727-28 (10th Cir. 1988) (emphasis added).[9]

---

[9]See also RGI, Inc. v. Tucker & Assocs., 858 F.2d 227, 230 (5th Cir. 1988) ("Where the parties' contract provides for injunctive relief pending arbitration . . . the court need not involve itself in balancing the various factors . . . . [I]t was appropriate for the district court to issue the preliminary injunction to insure that the arbitration clause of the contract will be carried out as written."); Peabody Coalsales v. Tampa Electric, 36 F.3d 46, 48 (8th Cir. 1994) (an order compelling arbitration in accordance with the terms of the agreement "must necessarily include an

Denying Merrill Lynch interim injunctive relief in court pending arbitration on the merits would also violate the basic tenet of the FAA, 9 U.S.C. §§ 3-4, which is to "ensure that commercial arbitration agreements, like other contracts, are enforced according to their terms" and "according to the intentions of the parties." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 947 (1995). See also Volt Information Sciences v. Leland Stanford, Jr. Univ., 489 U.S. 468, 478 (1988) (the FAA "simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms."); Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 219-21 (1985) ("[T]he legislative history of the [FAA] established that the purpose behind its passage was to ensure judicial enforcement of privately made agreements to arbitrate."); Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 23 (1983) (discussing the FAA and noting that "the statutory policy of rapid and unobstructed enforcement of arbitration agreements," and holding that arbitration agreements must be enforced as written, even if it means piecemeal litigation). Thus, any suggestion by Defendant that Merrill Lynch somehow is evading its obligation to arbitrate by seeking injunctive relief in court is baseless. In seeking relief in court, Merrill Lynch is exercising a right which it always has had under the FAA, the parties' Agreement and that which Rule 10335 codified in the NASD Code. See Merrill Lynch's Supplemental Memorandum Regarding Rule 10335 of the NASD Code of Arbitration Procedure for a fuller discussion of this issue.

---

order requiring continued performance."); Nemer Jeep-Eagle v. Jeep-Eagle Sales Corp., 992 F.2d 430, 433 (2d Cir. 1993) ("[W]here a party's request for a status quo injunction pending arbitration is grounded in the words of a contract, specific performance analysis is required.").

## III.    CONCLUSION

For the foregoing reasons, Merrill Lynch respectfully requests that the Court grant its motion for a temporary restraining order and preliminary injunction pending an expedited arbitration hearing on the merits of this dispute before a panel of duly appointed arbitrators pursuant to Section 10335(g) of the National Association of Securities Dealers Code of Arbitration Procedure.

Dated this _22nd_ day of October 2001.

PARR WADDOUPS BROWN GEE & LOVELESS
and RUBIN & ASSOCIATES


_____
Jonathan O. Hafen
Stephen E. W. Hale
Timothy S. Cole
Maria V. Martin
Attorneys for Plaintiff Merrill, Lynch, Pierce,
Fenner & Smith Incorporated

## CERTIFICATE OF SERVICE

I hereby certify that on the _22ⁿᵈ_ of October, 2001, true and correct copies of the

REPLY MEMORANDUM OF LAW IN SUPPORT OF MERRILL LYNCH'S MOTION FOR

A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, were served

by hand-delivery upon the following:

> Scott A. Hagen
> RAY, QUINNEY & NEBEKER
> 79 South Main Street
> P.O. Box 45385
> Salt Lake City, Utah  84145-0385

8255v1

30

Exhibits/
Attachments
to this document
have **not** been
scanned.


Please see the
case file.